### JONES v. PAN AMERICAN PETROLEUM CORPORATION et al.

#### No. 5848.

Court of Appeal of Louisiana. Second Circuit.
April 28, 1939.

Rehearing Denied May 29, 1939.

205

Dhu Thompson, of Monroe, for appellant.

Shotwell & Brown, of Monroe, for appellee Pan American Petroleum Corp.

C. T. Munholland, all of Monroe, for appellee Lemle.

DREW, Judge.

Plaintiff, Ivory Jones, for the use and benefit of his minor son, Odell Jones, instituted this suit under the Workmen's Compensation Law of this state, Act No. 20 of 1914, for the sum of $3.25 per week for a period of 100 weeks, for the loss of an eye sustained by Odell Jones while he was discharging his duties and acting within the scope and course of his employment at a filling station located in the City of Monroe, Louisiana. He joined as defendants Pan American Petroleum Corporation, Lee Lemle, Leanard Lemle, and Ronald Vance Hale, and prayed for judgment against them in solido for $325, plus

$250 medical expenses and hospital bills. Default was entered against Leanard Lemle and Ronald Vance Hale and was confirmed upon the trial of the case, awarding plaintiff the sum of $3.25 per week for a period of 100 weeks.

Defendants Lee Lemle and Pan American Petroleum Corporation both answered, denying the allegations of plaintiff's petition. They both contend that they did not own or operate the filling station where Odell Jones was employed and had no connection with the operation of it in any manner; that they had no authority to employ or fire help for the station and no supervision or control over its operation.

The lower court, after hearing the testimony and at the conclusion thereof, dictated into the record its judgment rejecting the demands as to these two defendants. From that judgment plaintiff prosecutes this appeal.

It is conceded by all parties to this litigation that only questions of fact are involved. Therefore, the finding of the lower court will not be disturbed unless manifestly erroneous. After carefully studying the record, we fail to find such error.

On July 14, 1934, W. B. Warren and J. L. Warren, individually, leased to the Pan American Petroleum Corporation the lot on which is now located the filling station involved here, for a term beginning October 1, 1934, and terminating September 30, 1939, for a monthly rental equal to 1 cent for each gallon of gasoline sold on said premises, provided the rental for any one month should not be less than $40. Under this lease the Pan American Petroleum Corporation erected the filling station on the lot.

On March 1, 1935, Pan American Petroleum Corporation leased to Warren & Warren, Inc., the lot and filling station for a consideration of $25 per month plus 1 cent per gallon for all gasoline sold from the station. Thereafter, by oral agreement, Warren & Warren, Inc., who were the wholesale distributors of Pan American products in that territory, through Gregory Warren, leased the lot and filling station to Lee Lemle for his son Leanard Lemle, who intended to and did operate the filling station. Leanard Lemle secured Harry Hatton to join him in the business under an agreement that

each would receive as his share fifty per cent of the profits. This arrangement lasted a few months, when Harry Hatton pulled out and Ronald Vance Hale became a partner with Leanard Lemle under the same arrangement. Hatton had not brought any money into the business when he came, and took none away when he left. He had, however, received his portion of the proceeds during the time he was there. When Hale came into the business he did not put any money in it. He took his share of the profits while there and took nothing out of the business when he left, which was a short time before Leanard Lemle went out of business.

■■■ Lee Lemle, the father of Leanard Lemle, secured the lease for his son and furnished the money,—some two or three hundred dollars,—for Leanard and his partner to purchase the necessary oil, gasoline and other commodities with which to begin business. He states it was in the form of a loan to them and is corroborated by his son and by both Hatton and Hale, who were at different times partners of his son Leanard. They paid back to Lee Lemle approximately $40 or $50 and after the business was closed down there was about $25 on hand, which was turned over to Lee Lemle. Some property they had on hand for use in the station was sold and the proceeds were given to Lee Lemle. He did not recover the full amount he had loaned to the business. He explains his part in the business to our satisfaction. His son, Leanard, was unemployed and in order to give him employment and a chance to learn a trade or business, he set him up in the filling station business. Leanard secured a partner. It was never contemplated that Lee Lemle would receive any of the proceeds. He had no control over the business, no authority to hire or fire any help. The monthly rent was paid by those in charge of the station. In fact, every time gasoline was purchased 1 cent a gallon was added to the purchase price as rent and paid for in cash out of the money previously received for gasoline and other products sold. Lee Lemle took more privileges while at the filling station than a stranger would, but no more than any father would at his son's place of business. He wanted to see his son succeed and no doubt gave what assistance he could. H: purchased for his own car gasoline and oil at his son's station and paid the regular retail price. We are convinced he was not an interested partner in the business and is not liable under the compensation law to the plaintiff.

■■■ In the sublease from Pan American Petroleum Corporation to Warren & Warren, Inc., there appears the following clause: "The lessee agrees to operate this station according to instructions and directions from lessor in so far as the gasoline and oil vending business is concerned." The sign on the front of the station was "Pan American Petroleum Corporation." The operators of the station gave out blotters advertising Pan Am oils and gasoline, and stamped on their face, with a rubber stamp, "Pan Am Service Station, Washing and Greasing, Third & Louisiana," this last being the location of the station in the City of Monroe. The young men operating the station testified they stamped the blotters with a rubber stamp found in the station and did so without the knowledge of the Pan American Petroleum Corporation; that no one connected with the Pan American Petroleum Corporation ever visited the station and they never received any instructions or directions of any kind from the corporation. They handled the Pan Am products because they wanted to. They paid cash for them as they were received and felt at liberty at all times to do whatever they wanted to with them after they were paid for. They were never instructed as to the price to charge and felt at liberty to sell for whatever price they wished to fix. If the Pan American Petroleum Corporation had any authority over their business they did not know it. We are certain no authority was exercised over the station by the corporation, and if it had any authority or supervision it was unknown to the operators, Leanard Lemle and his partners. We are not forgetful of the rule that the actual supervision exercised is not what governs, but that the right to supervise is what governs, whether exercised or not.

■■■ Under the peculiar facts of this case we cannot say what right to supervise, if any, the Pan American Petroleum Corporation had. It is certain it was limited to giving instructions and directions in so far as the selling of gasoline and oil is concerned. It certainly had no control over that part of the business of washing, greasing, fixing and changing tires, etc. It was while changing a tire that Odell Jones injured his eye. Without

explanation, we do not know to what extent its control was over selling of oil and gasoline. To our minds, without some explanation, the clause is vague and uncertain and is not sufficient for us to hold that the business operated by Leanard Lemle and his partner, Hale, was the business of the Pan American Petroleum Corporation. In order for us to so hold we would have to find that the operators were the agents of the Pan American Petroleum Corporation, and their acts in employing Odell Jones were the acts of the corporation; or that they were independent contractors of and with the Pan American Petroleum Corporation; and therefore the rule that an employee of the independent contractor can recover from the master put into effect. The testimony in this record does not justify either of such findings.

We find no error in the judgment of the lower court and it is affirmed with costs.